**No. 25-2230**

---

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

YUSEF SALAAM, ET AL.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 2:24-cv-5560

---

# BRIEF OF AMICI CURIAE TENNESSEE AND 17 OTHER STATES SUPPORTING APPELLANT

---


Jonathan Skrmetti
*Attorney General & Reporter*

Madeline W. Clark
*Principal Deputy*
*Solicitor General*

Aaron L. Bernard
*Assistant Solicitor General*

OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-3234
Aaron.Bernard@ag.tn.gov

## TABLE OF CONTENTS


INTEREST OF *AMICI CURIAE* .... 1

SUMMARY OF THE ARGUMENT .... 2

ARGUMENT .... 5

I. Federalism must guide this Court's inquiry. .... 5

 A. Federalism-based canons regularly prevent federal intrusion on state interests. .... 6

 B. Federal Rules should be construed to avoid conflicts with state laws. .... 10

 C. A federalism approach abides by congressionally imposed limits on the Federal Rules. .... 17

II. The Federal Rules of Civil Procedure and UPEPA should be construed harmoniously. .... 19

CONCLUSION .... 23

ADDITIONAL COUNSEL .... 25

CONSOLIDATED CERTIFICATE OF COMPLIANCE .... 26

CERTIFICATE OF BAR MEMBERSHIP .... 27

CERTIFICATE OF SERVICE .... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 22

*Berk v. Choy*,
607 U.S. 187 (2026) .......... *passim*

*BFP v. Resol. Tr. Corp.*,
511 U.S. 531 (1994) .......... 9

*Bond v. United States,*
(*Bond I*), 564 U.S. 211 (2011) .......... 7

*Bond v. United States,*
(*Bond II*), 572 U.S. 844 (2014) .......... 8, 9, 10

*Boyle v. United Techs. Corp.*,
487 U.S. 500 (1988) .......... 12

*Burlington N. R.R. Co. v. Woods*,
480 U.S. 1 (1987) .......... 14

*California v. Zook*,
336 U.S. 725 (1949) .......... 22

*Charles v. McQueen*,
693 S.W.3d 262 (Tenn. 2024) .......... 2, 17

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) .......... 5, 8

*Cohen v. Beneficial Ind. Loan Corp.*,
337 U.S. 541 (1949) .......... 15

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) .......... 20

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938) .......... 1

*Flade v. City of Shelbyville*,
699 S.W.3d 272 (Tenn. 2024) .......... 2

*FTC v. Bunte Bros.*,
312 U.S. 349 (1941) .......... 10

*Gasperini v. Ctr. for Humans., Inc.*,
518 U.S. 415 (1996) .......... *passim*

*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010) .......... 20

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... *passim*

*Guar. Tr. Co. of N.Y. v. York*,
326 U.S. 99 (1945) .......... 1

*Hanna v. Plumer*,
380 U.S. 460 (1965) .......... 1, 12, 15

*Jones v. United States*,
529 U.S. 848 (2000) .......... 9

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .......... 17

*La Liberte v. Reid*,
966 F.3d 79 (2d Cir. 2020) .......... 20

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... 9

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......... 6

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
578 U.S. 374 (2016) .......... 10

*Palmer v. Hoffman*,
318 U.S. 109 (1943) .......... 14

*Ragan v. Merchs. Transfer & Warehouse Co.*,
337 U.S. 530 (1949) .......... 14, 15

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 8

*Sackett v. EPA*,
598 U.S. 651 (2023) .......... 5, 17

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
531 U.S. 497 (2001) .......... 15, 16, 19

*Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*,
559 U.S. 393 (2010) .......... *passim*

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) .......... 9

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
590 U.S. 604 (2020) .......... 9

*United States v. Bass*,
404 U.S. 336 (1971) .......... 9

*United States v. Five Gambling Devices Labeled in Part "Mills," & Bearing Serial Nos. 593-221*, 346 U.S. 441 (1953) .......... 10

*Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980) .......... 11, 15, 20

*West Virginia v. EPA*, 597 U.S. 697 (2022) .......... 7

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) .......... 9

**Statutes**

28 U.S.C. § 2072 .......... 6, 17

28 U.S.C. § 2072(b) .......... 2, 19

42 Pa. Cons. Stat. § 8340.15(1)(ii) .......... 4, 20, 22, 23

42 Pa. Cons. Stat. § 8340.15(2) .......... 21

42 Pa. Cons. Stat. § 8340.16(c) .......... 21

**Rules**

Fed. R. Civ. P. 8 .......... 22

Fed. R. Civ. P. 12 .......... 22

Fed. R. Civ. P. 12(b)(6) .......... *passim*

Fed. R. Civ. P. 12(d) .......... 22

Fed. R. Civ. P. 56 .......... 21

## Other Authorities

Joseph P. Bauer, *Shedding Light on* Shady Grove*: Some Further Reflections on the* Erie *Doctrine from a Conflicts Perspective*, 86 Notre Dame L. Rev. 939 (2011) .......................................................13

Michael Berry and Kaitlin M. Gurney, *Pennsylvania Joins States Enacting Tough Anti-SLAPP Protections: The New Uniform Public Expression Protection Act*, 96 Pa. Bar Ass'n Q. 1 (2025).................................................................21

Charles E. Clark, *State Law in the Federal Courts: The Brooding Omnipresence of* Erie v. Tompkins, 55 Yale L. J. 267 (1946).........................................................................5

Earl C. Dudley, Jr., and George Rutherglen, *Deforming the Federal Rules: An Essay on What's Wrong with Recent* Erie *Decisions*, 92 Va. L. Rev. 707 (2006)......................................................................10

Allan Erbsen, Erie*'s Starting Points: The Potential Role of Default Rules in Structuring Choice of Law Analysis*, 10 J. L. Econ. & Pol'y 125 (2013)...........................................................11

Allan Ides, *The Standard for Measuring the Validity of A Federal Rule of Civil Procedure: The* Shady Grove *Debate Between Justices Scalia and Stevens*, 86 Notre Dame L. Rev. 1041 (2011) .....................................................16

Glenn S. Koppel, *The Fruits of* Shady Grove*: Seeing the Forest for the Trees*, 44 Akron L. Rev. 999 (2011) ..................................................................12

Adam N. Steinman, *What Is the* Erie *Doctrine? (And What Does It Mean for the Contemporary Politics of Judicial Federalism?)*, 84 Notre Dame L. Rev. 245 (2008) ......................................................12

Margaret S. Thomas, *Constraining the Federal Rules of Civil Procedure Through the Federalism Canons of Statutory Interpretation*, 16 N.Y.U. J. Legis. & Pub. Pol'y 187 (2013) ............................... 8, 17, 18

Joshua P. Zoffer, Note, *An Avoidance Canon for* Erie: *Using Federalism to Resolve* Shady Grove's *Conflicts Analysis Problem*, 128 Yale L. J. 482 (2018) .................................................. 11, 12, 13, 16

## INTEREST OF AMICI CURIAE

The *amici* States have a long-recognized interest in protecting the proper allocation of governmental power between the federal government and the States. That interest includes ensuring that the "legal rules determin[ing] the outcome" of a state-law claim brought in federal court by virtue of diversity jurisdiction are "substantially the same" as they "would be if tried in a State court." *See Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945). Indeed, respect for substantive state interests by federal courts sitting in diversity is "one of the modern cornerstones of our federalism." *See Hanna v. Plumer*, 380 U.S. 460, 474 (1965) (Harlan, J., concurring). But the "federalism grounding" of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), and its progeny has become "ero[ded]" in the context of alleged conflicts between Federal Rules and state laws. *See Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 458 (2010) (Ginsburg, J., dissenting).

The *amici* States urge this Court to reverse the district court and recognize that "important state interests and regulatory policies," *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 n.7 (1996), must guide courts in navigating alleged conflicts between Federal Rules and

state laws. Rather than reading Federal Rules broadly to invite clashes with state laws, courts should return to *Erie*'s roots and employ federalism-based canons to favor interpretations that fairly avoid such conflicts. On top of furthering federalism, this approach also comports with Congress's command that the Federal Rules may not "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).

Beyond that, Tennessee and "over thirty states now have anti-SLAPP statutes in place, and while the particular language varies, the stated purpose of anti-SLAPP legislation is consistent." *Flade v. City of Shelbyville*, 699 S.W.3d 272, 301 (Tenn. 2024) (citation omitted). *Amici* States have a strong interest in protecting the rights secured by state anti-SLAPP laws.[1]

## SUMMARY OF THE ARGUMENT

According to the district court, Pennsylvania's Uniform Public Expression Protection Act (UPEPA) does not apply in federal diversity

[1] "The acronym 'SLAPP' stands for strategic lawsuits against public participation. The primary aim of a SLAPP is not to prevail on the merits, but rather to chill the speech of the defendant by subjecting him or her to costly and otherwise burdensome litigation." *Charles v. McQueen*, 693 S.W.3d 262, 267 (Tenn. 2024).

actions because it conflicts with the Federal Rules of Civil Procedure. But before overriding UPEPA and similar state anti-SLAPP laws that are carefully crafted to advance important state interests, this Court should employ familiar federalism-based canons to ask, "Is this conflict really necessary?" *Shady Grove*, 559 U.S. at 458 (Ginsburg, J., dissenting). So considered, the answer is "no."

**I.** Courts regularly consider federalism when determining the scope of federal statutes. Recognizing that Congress legislates against the backdrop of our federal system, courts typically allow only the clearest textual commands to alter the balance of State and federal power. This federalism-based interpretive principle is deeply rooted in the Supreme Court's jurisprudence and is often invoked to preserve the States' broad authority.

Similar interpretative canons are warranted for determining the scope of Federal Rules. Such an approach is in line with the federalism underpinnings of *Erie* and its progeny. It also comports with past decisions that have interpreted Federal Rules with "sensitivity to important state interests and regulatory policies," *Gasperini*, 518 U.S. at 427 n.7, as well as the Supreme Court's recent command to "interpret the Federal

Rules the same way we interpret federal laws more generally[.]" *Berk v. Choy*, 607 U.S. 187, 192 (2026).

Applying federalism-based canons when interpreting Federal Rules also respects the explicit limits that Congress has placed in the Rules Enabling Act. Courts regularly evaluate regulatory actions by federal agencies through a federalism lens, requiring a clear statement of congressional intent before allowing overrides of core state interests. Evaluating the validity of the Federal Rules should proceed similarly.

**II.** With that federalism framing in mind, UPEPA and Federal Rule of Civil Procedure 12(b)(6) operate harmoniously. Both require the exact same thing: They ask a court to dismiss a lawsuit when a plaintiff fails to "state a cause of action upon which relief can be granted." 42 Pa. Cons. Stat. § 8340.15(1)(ii); *see* Fed. R. Civ. P. 12(b)(6). And unlike the Supreme Court's recent decision in *Berk*, state law and the Federal Rules impose the same standard—the failure to state a claim upon which relief can be granted. Particularly because courts should construe the Federal Rules with respect for state interests in mind, this Court should not find a clash between UPEPA and the Federal Rules.

## ARGUMENT

### I. Federalism must guide this Court's inquiry.

The "difficulties of adjusting the spheres of authority of two independent, co-ordinate, and largely competitive sovereignties operating in the same territory" are inherent to "our federal system." Charles E. Clark, *State Law in the Federal Courts: The Brooding Omnipresence of* Erie v. Tompkins, 55 Yale L. J. 267, 269 (1946). To protect the constitutional balance of power between the States and the federal government, courts regularly apply federalism-based interpretative canons to federal statutes and regulatory actions to prevent unintended interference with core state interests, *see Sackett v. EPA*, 598 U.S. 651, 679 (2023), or preemption of state laws, *see Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). These canons require clear congressional intent to displace state prerogatives.

A similar approach is warranted when assessing whether a Federal Rule preempts a state law. *See Gasperini*, 518 U.S. at 427 n.7; *Berk*, 607 U.S. at 201 n.1 (Jackson, J., concurring in the judgment). Indeed, five Justices in *Shady Grove* explicitly recognized the general need "to interpret Federal Rules with awareness of, and sensitivity to, important state regulatory policies." *Shady Grove*, 559 U.S. at 437, 442 n.2 (Ginsburg, J.,

dissenting); *see id.* at 418, 430 (Stevens, J., concurring in part and concurring in the judgment). And the other four Justices accepted that conflict-avoiding approach, at least for "ambiguous Federal Rule[s]," to avoid "substantial variations [in outcomes] between state and federal litigation." *See id.* at 405 n.7 (quotation omitted). Using well-worn federalism-based canons to "fairly construe[]" Federal Rules to avoid conflicts with state anti-SLAPP laws would reinforce "the federalism principles undergirding *Erie*." *See id.* at 439, 451 (Ginsburg, J., dissenting). It would also maintain the "balance that Congress struck" in 28 U.S.C. § 2072 between uniform rules of federal procedure and substantive state-created rights. *See id.* at 424-25 (Stevens, J., concurring in part and concurring in the judgment).

### A. Federalism-based canons regularly prevent federal intrusion on state interests.

"[O]ur Constitution establishes a system of dual sovereignty" that divides power "between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). Under that system, the federal government wields only the "enumerated powers" that the States surrendered in the Constitution. *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405 (1819). The States, by contrast, retain "numerous and

indefinite" powers that "extend to all the objects … concern[ing] the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the State[s]." *Gregory*, 501 U.S. at 458 (quoting *The Federalist* No. 45, at 292-93 (James Madison) (Clinton Rossiter ed. 1961)).

This system of joint sovereignty "preserves the integrity, dignity, and residual sovereignty of the States," and thereby "secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond v. United States* (*Bond I*), 564 U.S. 211, 221 (2011) (quotations omitted). Such diffusion of power in turn "assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society," "makes government more responsive by putting the States in competition for a mobile citizenry," and "allows for more innovation and experimentation in government." *Gregory*, 501 U.S. at 458. In short, reserving States' significant lawmaking powers reflects that citizens are often best served by "governments more local and more accountable than a distant federal authority." *West Virginia v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch, J., concurring) (cleaned up).

Recognizing the importance of state sovereignty, courts have long presumed that Congress legislates with an eye toward preserving "the constitutional balance between the National Government and the States." *See Bond v. United States* (*Bond II*), 572 U.S. 844, 862 (2014) (quotation omitted). So any inquiry into whether a federal law preempts state law "start[s] with the assumption that the historic police powers of the State [are] not to be superseded by … Federal Act unless that [is] the clear and manifest purpose of Congress." *Cipollone*, 505 U.S. at 516 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). It is thus not enough for preemption that a state law merely frustrates a federal purpose. Rather, "rebutting the presumption" against preemption "requires a showing that preemption is implicitly *required* by the statutory structure or purpose." Margaret S. Thomas, *Constraining the Federal Rules of Civil Procedure Through the Federalism Canons of Statutory Interpretation*, 16 N.Y.U. J. Legis. & Pub. Pol'y 187, 225-26 (2013) (emphasis added).

Otherwise, to displace traditional spheres of state authority, Congress must "make its intention to do so 'unmistakably clear in the language of [a] statute.'" *Gregory,* 501 U.S. at 460 (quoting *Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 65 (1989)). The text itself must contain "exceedingly clear language … to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020).

These federalism-based interpretive principles are well-established and often invoked when construing acts of Congress. The Supreme Court has respected federalism when interpreting laws that implicate civil rights, property rights, natural resources, and criminal punishment. *See id.* at 621-22; *Bond II*, 572 U.S. at 857-60; *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001); *Jones v. United States*, 529 U.S. 848, 858 (2000); *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994); *Will*, 491 U.S. at 65; *United States v. Bass,* 404 U.S. 336, 349-50 (1971). The Supreme Court has also respected federalism when considering laws setting qualifications for state office, *Gregory*, 501 U.S. at 457-64, and laws regulating interactions between state officials and their constituents, *McDonnell v. United States*, 579 U.S. 550, 576-77 (2016). It has repeatedly shown respect for federalism when construing congressional delegations of legislative power. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam); *United States v. Five*

*Gambling Devices Labeled in Part "Mills," & Bearing Serial Nos. 593-221*, 346 U.S. 441, 449-51 (1953); *FTC v. Bunte Bros.*, 312 U.S. 349, 351 (1941). And "[o]ut of respect for state courts, [the Supreme] Court has time and again declined to construe federal jurisdictional statutes more expansively than their language, most fairly read, requires." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 389 (2016).

In sum: Before upsetting "the usual constitutional balance of federal and state powers," it is "incumbent upon the … courts to be certain of Congress'[s] intent." *Bond II*, 572 U.S. at 858 (quoting *Gregory*, 501 U.S. at 460) (cleaned up).

### B. Federal Rules should be construed to avoid conflicts with state laws.

The "principal arena in which controversies persist under the *Erie* doctrine" is "conflicts with the Federal Rules and state law." Earl C. Dudley, Jr., and George Rutherglen, *Deforming the Federal Rules: An Essay on What's Wrong with Recent* Erie *Decisions*, 92 Va. L. Rev. 707, 737 (2006). But are these "conflict[s] really necessary?" *Shady Grove*, 559 U.S. at 437 (Ginsburg, J., dissenting). In answering that question, "[t]he scope of a federal rule is often the central disputed issue," but courts have "tied [themselves] in knots trying to explain how to determine that

scope." Allan Erbsen, Erie'*s Starting Points: The Potential Role of Default Rules in Structuring Choice of Law Analysis*, 10 J. L. Econ. & Pol'y 125, 146-47 (2013).

The familiar federalism-based canons provide the solution. As the Supreme Court recently made plain, courts "interpret the Federal Rules the *same way we interpret federal laws more generally*: by giving them their 'plain meaning.'" *Berk*, 607 U.S. at 192 (emphasis added) (quoting *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750 n.9 (1980)). And consonant with the Supreme Court's general approach to interpreting federal statutes that run up against core state authorities, *see supra* 6-10, "fairly" construing "the federal rules to avoid conflict with important state regulatory policies" properly stalls federal preemption of core state prerogatives. *See Shady Grove*, 559 U.S. at 439, 441 (Ginsburg, J., dissenting) (quotation omitted); *id.* at 421, 430 (Stevens, J., concurring in part and concurring in the judgment). Following the well-trodden path of the federalism-based canons "pay[s] greater respect to important state interests by more often giving them effect in federal court," thereby reinforcing *Erie*'s federalism underpinnings and "protect[ing] the separation of powers by limiting judicial power to displace state law." Joshua P. Zoffer,

Note, *An Avoidance Canon for* Erie: *Using Federalism to Resolve* Shady Grove's *Conflicts Analysis Problem*, 128 Yale L. J. 482, 489 (2018).

**1.** *Erie* and its progeny are "deeply rooted in notions of federalism." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 517 (1988) (Brennan, J., dissenting). Indeed, *Erie* has been described as "one of the modern cornerstones of our federalism." *Hanna*, 380 U.S. at 474 (Harlan, J., concurring). The "constitutional core" of *Erie* is that "federal judicial lawmaking cannot override substantive rights where such lawmaking has only an adjudicative rationale." Adam N. Steinman, *What Is the* Erie *Doctrine? (And What Does It Mean for the Contemporary Politics of Judicial Federalism?)*, 84 Notre Dame L. Rev. 245, 316 (2008); *see also* Zoffer, *supra*, at 508 (describing the appropriate federal-state balance of power as "a value of constitutional magnitude"). This "helped to restore eroded State power and prepare for a realignment of State and federal areas of concern." Glenn S. Koppel, *The Fruits of* Shady Grove*: Seeing the Forest for the Trees*, 44 Akron L. Rev. 999, 1013 (2011) (citation omitted).

Employing "relentless[]" or "wooden[]" interpretations of the Federal Rules "unwisely and unnecessarily retreats from the federalism principles undergirding *Erie*." *See Shady Grove*, 559 U.S. at 437, 451

(Ginsburg, J., dissenting); *see also* Joseph P. Bauer, *Shedding Light on* Shady Grove*: Some Further Reflections on the* Erie *Doctrine from a Conflicts Perspective,* 86 Notre Dame L. Rev. 939, 985 (2011) (criticizing *Shady Grove* for failing to "take seriously ... the agreed benefits of identifying, and then deferring to, state interests"). Indeed, such an "approach … will necessarily undermine State policies and regulatory goals." *See* Zoffer, *supra*, at 519. This in turn "cuts against" important aspects of our federal system, like the "diffusion of sovereign power and the role of States as innovators, as competitors in a policy market, and as guarantors of legal rights." *See id.* at 508 & n.128.

**2.** Five Justices therefore "agree[d]" in *Shady Grove* that "Federal Rules should be read with moderation in diversity suits to accommodate important state concerns." 559 U.S. at 442 n.2 (Ginsburg, J., dissenting); *see id.* at 418, 430-31 (Stevens, J., concurring in part and concurring in the judgment); *see also Berk*, 607 U.S. at 201 n.1 (Jackson, J., concurring in the judgment) (similar). Even the four other Justices recognized that when more than "one reading" of a rule is possible, the rule should be read to "avoid 'substantive variations [in outcomes] between state and federal litigation.'" *See Shady Grove*, 559 U.S. at 405 n.7 (citation

omitted). So, where a Federal Rule can be "fairly construed" using familiar federalism-based canons to "leav[e] … room for the operation" of the state law, the latter should apply. *See Burlington N. R.R. Co. v. Woods,* 480 U.S. 1, 4-5 (1987); *Shady Grove*, 559 U.S. at 452-58 (Ginsburg, J., dissenting).

This approach is consistent with a long line of cases that have "interpreted the Federal Rules … with sensitivity to important state interests and regulatory policies." *Gasperini*, 518 U.S. at 427 n.7; *see Shady Grove*, 559 U.S. at 439 (Ginsburg, J., dissenting). And it follows the Supreme Court's most recent instruction to interpret the federal rules the "same way [Courts] interpret federal laws more generally[.]" *Berk*, 607 U.S. at 192; *see supra* 6-10 (discussing the federalism-based canons' well-settled impact on the interpretation of federal law).

The Supreme Court has commonly construed Federal Rules with an eye to state regulation. In *Palmer v. Hoffman*, it read Federal Rule 8(c), which lists affirmative defenses, to control only the *manner* of pleading the listed defenses in diversity cases, while state law controls the *burden of proof* in those cases. 318 U.S. 109, 117 (1943). In *Ragan v. Merchants Transfer & Warehouse Co.*, it held that Rule 3's specification that "[a]

civil action is commenced by filing a complaint with the court" could co-exist with a state law that keyed commencement to service of the summons. 337 U.S. 530, 531-33 & n.1 (1949). In *Cohen v. Beneficial Industrial Loan Corp.*, it held that even though the Federal Rule specifying prerequisites for stockholders to maintain a derivative suit did not require a bond as security for cost, a state statute requiring such a bond should nonetheless be enforced. *See* 337 U.S. 541, 556 (1949).

And although *Hanna* found the conflict there "unavoidable," 380 U.S. at 470, the Supreme Court after *Hanna* "continued to "interpre[t] the federal rules to avoid conflict with important state regulatory policies," *Shady Grove*, 559 U.S. at 441 (Ginsburg, J., dissenting) (citation omitted). *Walker*, for example, avoided reading Federal Rule 3 to override state rules concerning the commencement of an action in light of significant state policy interests. 446 U.S. at 749-52. And in *Semtek International Inc. v. Lockheed Martin Corp.,* the Supreme Court held that Rule 41(b) did not bar an action that state law otherwise allowed because a different holding "'would arguably violate the jurisdictional limitation of the Rules Enabling Act' and 'would in many cases violate [*Erie*'s] federalism principle.'" *See Shady Grove*, 559 U.S. at 442 (Ginsburg, J.,

dissenting) (quoting, 531 U.S. 497, 503, 504 (2001)). That is why the Supreme Court has "cautioned" courts to "'interpre[t] the Federal Rules ... with sensitivity to important state interests,'" and "'to avoid conflict with important state regulatory policies.'" *Id.* (quoting *Gasperini*, 518 U.S. at 427 n.7, 438 n.22).

**3.** Avoiding conflicts also means "more frequent application of state law in federal courts," which will "better serve *Erie*'s twin aims." Zoffer, *supra*, at 523. "Whenever a Federal Rule displaces state law in federal court, it results in different legal standards in state and federal courts," inviting forum shopping. *Id.* at 523-24. Ignoring this concern would "undervalue[] a principle of federalism that arises when, in a diversity case, the conflicting law is both state-created and substantive." *See* Allan Ides, *The Standard for Measuring the Validity of A Federal Rule of Civil Procedure: The* Shady Grove *Debate Between Justices Scalia and Stevens*, 86 Notre Dame L. Rev. 1041, 1063 (2011).

Allowing federal courts to become havens for non-meritorious claims that would never survive in state court threatens to disrupt the balance of interests that States have carefully weighed in formulating their anti-SLAPP laws. For example, as the Tennessee Supreme Court

explained when interpreting Tennessee's anti-SLAPP law, such statutes seek to "balance between two competing interests." *Charles*, 693 S.W.3d at 267. "On the one hand, [they] seek[] to encourage and safeguard the constitutional rights of persons to petition, to speak freely, to associate freely, and to participate in government to the fullest extent permitted by law." *Id.* (citation omitted). On the other, they "also seek[] to protect the rights of persons to file meritorious lawsuits for demonstrable injury." *Id.* (citation omitted). Protecting that type of state policy judgment is the heartland of the federalism-based canons.

### C. A federalism approach abides by congressionally imposed limits on the Federal Rules.

Importing federalism-based canons to construe Federal Rules also flows from Congress's "incomplete" rulemaking delegation under the Rules Enabling Act. *See* Thomas, *supra*, at 241-43. As with regulations promulgated by federal executive agencies, *see, e.g.*, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), the Federal Rules derive from a congressional delegation of rulemaking authority, 28 U.S.C. § 2072. So just as Congress must use "clear" statutory language to authorize an agency to "significantly alter the balance between federal and state power," *see Sackett*, 598 U.S. at 679-80, the Court "should generally

presume" that Congress has not exercised its "constitutional power 'to supplant state law' with rules that are 'rationally capable of classification as procedure,'" *see Shady Grove*, 559 U.S. at 422 (Stevens, J., concurring in part and concurring in the judgment) (quoting *id.* at 406 (Scalia, J., plurality opinion)); *see also* Thomas, *supra*, at 241-42. In other words, adopting Federal Rules that intrude on traditional areas of state autonomy should require a "manifestation of intent by Congress to displace State law," particularly "in areas where States are exercising their historic police powers." *See* Thomas, *supra*, at 193.

And Congress's "mandate that federal rules 'shall not abridge, enlarge or modify any substantive right' evinces" an intent to preserve state laws promoting substantive state rights and policies, "as does Congress'[s] decision to delegate the creation of rules to this Court rather than to a political branch." *Shady Grove*, 559 U.S. at 422 (Stevens, J., concurring in part and concurring in the judgment). The limits imposed by the Rules Enabling Act were meant to strike a balance "between uniform rules of federal procedure and respect for a State's construction of its own rights and remedies." *Id.* at 424-25. They thereby enforce "the separation-of-powers presumption and federalism presumption that

counsel against judicially created rules displacing state substantive law" that animated *Erie*. *See id.* at 425 (citation omitted).

Thus, the inquiries into whether a Federal Rule unavoidably conflicts with state law and whether its application is valid under the Rules Enabling Act "bleed" together. *See id.* at 422; *see also Semtek Int'l Inc.*, 531 U.S. at 503-04 (interpreting Rule 41(b) to avoid a conflict because "the federal court's extinguishment of" a State-created right "would seem to violate" 28 U.S.C. § 2072(b)). "When a federal rule appears to abridge, enlarge, or modify a substantive right, federal courts" then "must consider whether the rule can reasonably be interpreted to avoid that impermissible result." *Shady Grove*, 559 U.S. at 422-23 (Stevens, J., concurring in part and concurring in the judgment). "This application" of the Rules Enabling Act "shows 'sensitivity to important state interests' and 'regulatory policies,' but it does so as Congress authorized." *Id.* at 423 (quoting *id.* at 437, 442 (Ginsburg, J., dissenting)).

## II. The Federal Rules of Civil Procedure and UPEPA should be construed harmoniously.

**A.** There is no conflict between Federal Rule of Civil Procedure 12(b)(6) and UPEPA. Both provide that a lawsuit cannot succeed when it fails to state a claim upon which relief can be granted.

Section 8340.15(1)(ii) defines the substantive conditions under which a claim can move forward under state law. And Rule 12(b)(6) is the procedural vehicle for vindicating that state substantive right in federal court. In that way, they "exist side by side" with "each controlling its own intended sphere of coverage without conflict." *Walker*, 446 U.S. at 752.

On that score, multiple sister circuits have upheld state anti-SLAPP laws in the face of supposedly conflicting Federal Rules. *See Godin v. Schencks*, 629 F.3d 79, 89 (1st Cir. 2010) (holding that Maine's anti-SLAPP law conflicts with "[n]either Fed. R. Civ. P. 12(b)(6) nor Fed. R. Civ. P. 56"). *CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1140-41 (9th Cir. 2022) (same, for California's anti-SLAPP law). To the extent that some circuits have gone the other way, those rulings were usually bound up with a particular procedure invoked by a special state law motion. *See La Liberte v. Reid*, 966 F.3d 79, 88-89 (2d Cir. 2020) (interpreting a "special motion to strike"); *see id.* at 86 (collecting cases). But here, the motion to dismiss invoked UPEPA and sought to "utilize[] the standard under" Rule 12(b)(6). App. 13 n.6.

True, as the district court pointed out, UPEPA's protections also apply when "[t]here is no genuine issue as to any material fact, and the

person against whom the cause of action based on protected public expression has been asserted is entitled to judgment as a matter of law in whole or in part." 42 Pa. Cons. Stat. § 8340.15(2). And that "language matches that of Federal Rule of Civil Procedure 56," which is the standard that "governs motions for summary judgment." App. 10. But UPEPA does not impose a "greater burden than existing procedural mechanisms for dismissing meritless claims before trial." Michael Berry and Kaitlin M. Gurney, *Pennsylvania Joins States Enacting Tough Anti-SLAPP Protections: The New Uniform Public Expression Protection Act*, 96 Pa. Bar Ass'n Q. 1, 14 n.83 (2025). Rather, its substantive protections can be asserted at different procedural stages, *see* 42 Pa. Cons. Stat. § 8340.16(c), with a different burden imposed on the plaintiff depending on the procedural stage. *Cf. id.* Said another way, although a defendant can rely on UPEPA's substantive protections at both the motion-to-dismiss phase and at summary judgment, it does not require a plaintiff to meet the summary-judgment standard at the motion-to-dismiss phase.

To the extent the statutory language suggests otherwise, federalism-based canons counsel this Court to construe state and federal law harmoniously, *see supra* 5-19. And here, UPEPA and Rule 12(b)(6) are

functionally the same: Both provide that a lawsuit cannot move forward when it fails to "state a cause of action upon which relief can be granted." 42 Pa. Cons. Stat. § 8340.15(1)(ii); *see* Fed. R. Civ. P. 12(b)(6). That overlap should be enough to apply UPEPA in federal court. After all, "there is no conflict in terms, and no possibility of such conflict, for the state statute makes federal law its own." *See California v. Zook*, 336 U.S. 725, 735 (1949).

**B.** *Berk* does not require a different result. There, the Supreme Court refused to apply a state law that required plaintiffs raising medical malpractice claims to file an expert affidavit with their complaint in federal court. 607 U.S. at 191, 193-95. The Court held that the added requirement of an affidavit directly conflicted with Federal Rule of Civil Procedure 8, which required no more "than a statement of the claim." *Id.* at 193. The Court also held that the affidavit requirement was contrary to multiple elements in Rule 12, which commands courts not to "consider 'matters outside the pleadings,'" *id.* (quoting Fed. R. Civ. P. 12(d)), and only assess "whether the complaint's factual allegations, if taken as true, 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Central to the

Court's reasoning was that the Federal Rule and the state law "addresse[d] the same issue," *but* "in doing so, [state law] impose[d] a different standard." *Id*. at 195.

Here, by contrast, the federal rule and the state statute impose the *same* standard. As discussed above, *see supra* 19-22, both require a court to dismiss a lawsuit when the plaintiff fails to "state a cause of action upon which relief can be granted." 42 Pa. Cons. Stat. § 8340.15(1)(ii); *see* Fed. R. Civ. P. 12(b)(6). Because state law and Rule 12(b)(6) run in parallel, there is no "contrary state law" to "displace." *Berk*, 607 U.S. at 192. Without such a "conflict," *id.* at 196, federal courts should continue to apply state substantive laws, like UPEPA.

## CONCLUSION

This Court should reverse.

Dated: June 4, 2026

Respectfully submitted,

Jonathan Skrmetti
*Attorney General & Reporter*

Madeline W. Clark
*Principal Deputy Solicitor General*

*/s/Aaron L. Bernard*
Aaron L. Bernard
*Assistant Solicitor General*

OFFICE OF THE TENNESSEE ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 532-3234
Aaron.Bernard@ag.tn.gov
TN B.P.R. No. 042585

*Counsel for Amicus Curiae State of Tennessee*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

CORI MILLS
Alaska Acting Attorney General

TIM GRIFFIN
Arkansas Attorney General

JAMES UTHMEIER
Florida Attorney General

CHRIS CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS W. KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

LYNN FITCH
Mississippi Attorney General

CATHERINE L. HANAWAY
Missouri Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

KEN PAXTON
Texas Attorney General

JOHN B. McCUSKEY
West Virginia Attorney General

## CONSOLIDATED CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,586 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

3. Pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

4. Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program, CrowdStrike Falcon Sensor version 7.20805.0, has been run on the electronic file and no virus was detected.

*/s/Aaron L. Bernard*
Aaron L. Bernard
*Assistant Solicitor General*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I certify that I am a member of the bar of this Court.

*/s/Aaron L. Bernard*
Aaron L. Bernard
*Assistant Solicitor General*

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2026, I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/Aaron L. Bernard*
Aaron L. Bernard
*Assistant Solicitor General*